*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, e-mail corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| GRAHAM R., | ) | |
| | ) | Supreme Court No. S-15158 |
| Appellant, | ) | |
| | ) | Superior Court No. 3CO-04-00002 CI |
| v. | ) | |
| | ) | O P I N I O N |
| JANE S., | ) | |
| | ) | No. 6955 - September 19, 2014 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Cordova, John R. Lohff, Judge pro tem.

Appearances: John C. Pharr, Law Offices of John C. Pharr, P.C., Anchorage, for Appellant. Kathryn Ruff Soden, ANDVSA Legal Advocacy Project, Anchorage, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

MAASSEN, Justice.

## I.    INTRODUCTION

Graham R. and Jane S. have one child.[1]  A 2006 court order granted Graham sole legal and primary physical custody.  In 2012 Graham traveled to California for heart surgery and took the child with him, cutting off contact with Jane and causing her to miss a number of scheduled visits.  When Graham returned to Alaska Jane moved

---

[1]    We use pseudonyms to protect the parties' privacy.

for sole legal and primary physical custody, and the superior court granted her motion after an evidentiary hearing. Graham appeals the superior court's order, arguing that it was barred by principles of res judicata and collateral estoppel; that the court erred in finding that his interference with Jane's visitation rights was an act of domestic violence that constituted changed circumstances; and that the court erred in admitting evidence of his criminal convictions and of the child's preferences. We affirm the superior court's order modifying custody, concluding that there was no error in its decision not to apply res judicata or collateral estoppel; that there were changed circumstances justifying a modification of custody; and that any evidentiary errors were harmless.

## II.    FACTS AND PROCEEDINGS

Graham and Jane were both married to others when their daughter Gabby was born in May 2003. According to Graham, Jane had agreed to carry a child to be adopted by him and his wife; according to Jane, Graham coerced her into it. In any event, Jane signed a document purporting to give Gabby to Graham and his wife a few days after the child was born. But Jane revoked that document less than a year later, and a dispute over Gabby's custody began.

### A.    The First Custody Order Grants Graham Primary Custody.

Graham and Jane reached a custody and visitation agreement that was approved by court order in March 2006. The order granted sole legal and primary physical custody of Gabby to Graham but allowed Jane visitation on alternate weekends, with additional visitation in the summer. Graham was allowed to take extended winter vacations with Gabby, so long as Jane was given make-up visits; the order also specifically authorized travel to the Philippines, where both parents have family. But travel required 30 days' advance notice to the other parent, a copy of the itinerary, contact information, and a copy of the return tickets.

**B.    Graham Travels To California With Gabby**.

On March 13, 2012, Graham suffered a heart attack and was transported from Cordova to Anchorage for emergency treatment.  Graham's wife went to Anchorage as well, taking Gabby along with her.  Jane, according to the schedule, was supposed to have Gabby on the weekend; but Graham's wife called the Cordova Family Resource Center, the usual location of the parents' custody exchanges, and, as she later testified, told someone there "we can't have the exchange for [Jane's] visitation because of emergencies [that] happen[ed] in our family."  Nicole Songer, the executive director of the Family Resource Center, testified about this message as well; she described its substance as only "that there would not be a visitation today due to . . . [Graham] being in Anchorage," with no information about how to call Graham back or how to get in touch with Gabby.  Jane also testified that she had no contact number for Graham and did not know where Gabby had gone.

On March 28, Graham left Anchorage for Los Angeles, California, accompanied by his wife and Gabby.  He underwent heart surgery in Los Angeles, was discharged from the hospital in stable condition on April 10, but remained in California.

Gabby continued to miss her scheduled weekend visits with Jane; according to Jane, she still did not know her daughter was in California.[2]  After a month of this, the Cordova Family Resource Center received a faxed letter from a California attorney representing Graham.  The letter, addressed to Songer, informed her that Graham had undergone "a 12-hour heart surgery in Los Angeles," that "his doctors estimated 3

---

[2]    Graham's wife testified that at every visitation time, "I call[ed] them [at the Family Resource Center] to notify them that we can't make it because [there was] still a problem with [Graham]."  It is unclear whether the superior court accepted this testimony.  In any event, Graham's wife did not testify that she ever explained where they were or provided any contact information; she testified that when she left her messages, she was never asked for a phone number.

months of recovery," that Gabby "wanted to stay with [her] dad," and that Gabby therefore had been enrolled at a local elementary school "in order not to disrupt her education." The letter stated that "[w]ith no complications in his recovery, [Graham's] family plans to go back to Cordova in 3 months." The letter advised Songer to direct any inquiries "to the undersigned," Graham's attorney. It provided no contact information for Graham or Gabby.

On May 24, Graham called the Cordova Family Resource Center. According to Songer, Graham said "that if [Jane] wanted visitation, then he would send [Gabby] back but [Jane] needed to pay for the ticket[,] and he needed to know immediately because he was going to send her the very next day." Songer testified that she passed this message on to Jane; when Graham called again the next day, Songer told him "that if he would send the receipt along with [Gabby], I would make sure that [Jane] got that receipt." But Graham demanded assurance that Jane would pay for the ticket, and when Songer failed to give it he hung up on her.

Fearing Gabby would never return, Jane sought a protective order to end Graham's interference with her visitation rights. The court issued an ex parte 20-day protective order on May 25, granting Jane temporary custody and granting visitation rights to Graham "[o]nce a week telephonically arranged and supervised by [the Cordova Family Resource Center]." But the order had no immediate effect, as neither Graham nor Gabby could be found.

A few days later, Songer received another faxed letter from Graham's California attorney. The letter stated that Graham had returned to Anchorage "for his rehabilitation and visitation by his cardiologist" but that his wife and Gabby "will be back in Cordova within this week." The letter enclosed a proposed summer visitation schedule and invited Songer to email the attorney with any questions.

On June 1, Graham's wife brought Gabby to the Cordova Family Resource Center for the start of summer visitation with Jane. During a July 16 hearing, the parents stipulated to a long-term protective order that prohibited either of them from taking Gabby away from Alaska. The magistrate judge heard no evidence about Graham's interference with Jane's visitation and, with the parties' concurrence, expressly declined to make any findings of domestic violence, child support, custody, or visitation. Through her attorney, Jane noted that she would be seeking custody modification in superior court.

### C.    The Modification Order Grants Jane Primary Custody.

Jane filed a motion to modify the existing custody order in October 2012, seeking sole legal and primary physical custody. The superior court held a hearing on the motion in April 2013. The court rejected Graham's arguments that the earlier domestic violence proceeding barred Jane's modification motion under principles of res judicata or collateral estoppel, then granted sole legal and primary physical custody to Jane. Graham received alternating weekend visits as well as six consecutive weeks of summer visitation; essentially, the previous custody arrangement was reversed.

The modification order was based in part on the court's finding that Graham committed the crime of custodial interference when he traveled to California with Gabby in the spring of 2012. The court found that this constituted a crime of domestic violence and therefore a change in circumstances under AS 25.20.110(c). The court then assessed the statutory best interest factors and concluded it was in Gabby's best interests that Jane have primary physical and sole legal custody.[3]

Graham appeals the modification order, challenging (1) the superior court's refusal to apply res judicata or collateral estoppel to the domestic violence petition in

---

[3]    *See* AS 25.24.150(c).

order to bar Jane's later motion to modify custody, (2) the finding that modification was proper under the circumstances, and (3) two evidentiary decisions: the admission of Gabby's hearsay statements about her preferences and the admission of Graham's misdemeanor convictions from 1996 and 1997.

## III. STANDARDS OF REVIEW

"A determination that a claim or issue is precluded is a question of law which we review de novo."[4]

In appeals of custody determinations and modifications, we allow broad discretion to the superior court, reversing only if the superior court's findings of fact are clearly erroneous or if it abused its discretion.[5] "A factual finding is clearly erroneous when a review of the record leaves the court with a definite and firm conviction that the superior court has made a mistake."[6] "An abuse of discretion exists where the superior court considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others."[7]

---

**4**     *Angleton v. Cox*, 238 P.3d 610, 614 (Alaska 2010) (citing *Maness v. Daily*, 184 P.3d 1, 5 (Alaska 2008)); *Alaska Wildlife Alliance v. State*, 74 P.3d 201, 205 (Alaska 2003).

**5**     *Ronny M. v. Nanette H.*, 303 P.3d 392, 399 (Alaska 2013) (citing *Hamilton v. Hamilton*, 42 P.3d 1107, 1111 (Alaska 2002)).

**6**     *Id.* (quoting *Fardig v. Fardig*, 56 P.3d 9, 11 (Alaska 2002)) (internal quotation marks omitted).

**7**     *Id.* (quoting *Siekawitch v. Siekawitch*, 956 P.2d 447, 449 (Alaska 1998)) (internal quotation marks omitted).

The superior court's admission of evidence is reviewed for abuse of discretion.[8] But even if admission was erroneous, "[w]e will reverse an evidentiary ruling only if [the] error prejudicially affected a party's substantial rights."[9]

## IV. DISCUSSION

### A. The Superior Court Correctly Ruled That Jane's Motion To Modify Custody Was Not Barred By Res Judicata Or Collateral Estoppel.

Graham contends that because Jane based her petition for a domestic violence restraining order on her allegations of custodial interference, and because the parties resolved the petition by stipulating to the entry of a long-term order, Jane should have been barred from later relying on the same allegations of custodial interference when she moved to modify custody. But the parties clearly and explicitly declined to litigate the issues of domestic violence and custody in the earlier proceeding, and neither res judicata nor collateral estoppel applies.

Res judicata bars relitigation of a claim when there was "(1) a final judgment of the merits, (2) from a court of competent jurisdiction,[] (3) in a dispute between the same parties . . . about the same cause of action."[10] But as we noted in *McAlpine v. Pacarro*, res judicata does not apply to custody modifications; the governing statute, AS 25.20.110, "provides an exception to the general principle that final judgments should not be disturbed — it allows parents to seek modification of child

---

**8** *Samaniego v. City of Kodiak*, 80 P.3d 216, 218 (Alaska 2003) (citing *Buster v. Gale*, 866 P.2d 837, 841 n.9 (Alaska 1994)).

**9** *Lum v. Koles*, 314 P.3d 546, 552 (Alaska 2013).

**10** *Kent V. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 233 P.3d 597, 600 (Alaska 2010) (alteration in the original) (quoting *Plumber v. Univ. of Alaska Anchorage*, 936 P.2d 163, 166 (Alaska 1977)) (internal quotation marks omitted).

custody based on a change of circumstances if modification is in the best interests of the child."[11] On modification motions, thus, relitigation of the same issues is prevented in large part by the requirement that the movant prove a "substantial change in circumstances" before being entitled to any relief;[12] a parent who attempts to relitigate the same set of circumstances will be unable to cross this threshold.

We further held in *McAlpine* that although res judicata does not apply to modification motions, "the principle of finality does — parties should not be allowed to relitigate 'in the hope of gaining a more favorable position.' "[13] But when a parent seeks to modify custody, both the statutory goals and the relevant considerations are much different from those in a domestic violence proceeding. We explained some of the differences in *Lashbrook v. Lashbrook*.[14] The issue was whether a father's due process right to a hearing on a motion to modify custody was satisfied by the fact that he had earlier attended a hearing on a domestic violence petition, addressing some of the same factual issues.[15] We held that the proceedings were too different.[16] We also noted that "the ultimate focus of the custody modification statute is the best interests of the children," which requires consideration of nine statutory factors, only one of which is

---

[11]    262 P.3d 622, 625 (Alaska 2011).

[12]    *Id.* at 626; *see Frackman v. Enzor*, 327 P.3d 878, 882 (Alaska 2014) (citations omitted) (holding that a parent moving for modification of a custody order bears the burden of proving a substantial change in circumstances).

[13]    *McAlpine*, 262 P.3d at 626 (quoting *Bunn v. House*, 934 P.2d 753, 758 n.12 (Alaska 1997)).

[14]    957 P.2d 326 (Alaska 1998).

[15]    *Id.* at 327-28.

[16]    *Id.* at 329.

domestic violence.[17] We noted that a finding of domestic violence in a modification proceeding satisfies only the movant's "threshold burden of establishing changed circumstances"; the movant still has the burden of proving that those changed circumstances warrant modification of the existing custody order.[18] "In sharp contrast," we noted, "the exclusive focus of [a domestic violence proceeding under] AS 18.66.100 is domestic violence."[19] In the domestic violence proceeding, a finding of domestic violence may result in a temporary change of custody, but the proceeding "is designed to provide emergency relief from domestic violence on a short-term basis, presumably until more permanent relief can be sought and fashioned,"[20] for example through a motion to modify custody. In *McAlpine*, these fundamental differences persuaded us that a hearing on a domestic violence petition was not a good substitute for the hearing that due process requires on a motion to modify custody.[21]

The differences were made explicit in this case. At the hearing on the long-term protective order, Jane's counsel repeatedly asserted that the hearing was not about custody but only about protecting Jane's visitation rights; Graham's counsel countered that the relief Jane requested was a de facto custody modification, which would keep Gabby with Jane in Cordova. But the parties agreed on the record to the essential relief Jane was seeking: that "[n]either party shall remove the child[] from Alaska" during the pendency of the order. The parties also expressly agreed that this relief could be, and

---

[17]    *Id.* at 328-29 (citing AS 25.24.150(c)).

[18]    *Id.* at 329.

[19]    *Id.*

[20]    *Id.*

[21]    *Id.* at 329-30.

should be, ordered without a finding that domestic violence had occurred, and the magistrate judge therefore intentionally left blank the spaces on the form order that called for findings about past domestic violence and threats. And again with the parties' express concurrence, the magistrate judge stated repeatedly that she was "not going to address anything with child support, custody, or visitation": "I am not changing the custody order that is in effect by the superior court in this particular case. That's not what this hearing was about." In short, the parties repeatedly and expressly declined to litigate issues of domestic violence *or* custody at the long-term domestic violence hearing, and there is no good argument that Jane, in her motion to modify custody, was attempting to relitigate issues that had already been decided.

We acknowledged in *McAlpine* that collateral estoppel *could* apply in the custody modification context, to prevent the relitigation of domestic violence allegations that had already been "actually raised and adjudicated."[22] Collateral estoppel bars relitigation when issues of fact or law "were actually litigated and necessarily decided in [a] prior proceeding."[23] But as the record shows, neither domestic violence nor custody was "actually litigated and necessarily decided" in the protective order proceeding, and collateral estoppel does not apply.[24]

---

[22]     *McAlpine v. Pacarro*, 262 P.3d 622, 627 (Alaska 2011)

[23]     *Campion v. State, Dep't of Cmty. & Reg'l Affairs, Hous. Assistance Div.*, 876 P.2d 1096, 1098 (Alaska 1994) (alteration in the original) (quoting *Americana Fabrics v. L & L Textiles*, 754 F.2d 1524, 1529 (9th Cir. 1985)) (internal quotation marks omitted).

[24]     *See Morris v. Horn*, 219 P.3d 198, 201, 203, 209-10 (Alaska 2009) (holding that a stipulated protective order does not preclude later litigation of a parent's history of domestic violence).

**B.     The Trial Court Did Not Err By Granting Jane's Motion To Modify Custody.**

The core of Graham's argument is that the superior court should not have modified the 2006 order granting him Gabby's primary physical custody and sole legal custody. A court may modify a custody award if it determines that (1) "a change in circumstances requires the modification of the award" and (2) "the modification is in the best interests of the child."[25] The superior court here found both requirements satisfied and modified Gabby's custody arrangement as requested by Jane; we see no error or abuse of discretion in its decision.

**1.     Graham's interference with Jane's visitation rights constituted a change in circumstances.**

The superior court found a change in circumstances justifying a modification of custody because Graham committed custodial interference, a crime of domestic violence.[26] Under AS 11.41.330(a), a person commits second degree custodial interference

> if, being a relative of a child under 18 years of age . . . and knowing that the person has no legal right to do so, the person takes, entices, or keeps that child . . . from *a lawful custodian* with intent to hold the child . . . for a protracted period. [Emphasis added.]

The 2006 custody order granted sole legal custody and primary physical custody to Graham. Jane was not the custodial parent (although she had visitation rights), and the "custodial interference" statute, by its terms, does not apply.

---

[25]     AS 25.20.110(a).

[26]     Under AS 25.20.110(c), "a finding that a crime involving domestic violence has occurred since the last custody or visitation determination is a finding of change of circumstances . . . ." *Jaymont v. Skillings-Donat*, 216 P.3d 534, 543 (Alaska 2009) (citing AS 18.66.990(3)(A); AS 11.41.320-.330).

However, "[w]e may affirm a judgment on any grounds that the record supports, even grounds not relied on by the superior court."[27] We have repeatedly held that "actions by a custodial parent which substantially interfere with the noncustodial parent's visitation rights are sufficient to constitute a change in circumstances."[28] Such interference can include "a detrimental and well-established pattern of behavior on the part of [the custodial parent] to 'erode the bonds of love and affection between the [other parent] and the children.' "[29] It can also include a custodial parent's attempt to unilaterally impose conditions on a court order, or a parent's failure to comply with an existing custody and visitation order.[30]

---

[27] *Terry S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 168 P.3d 489, 493 (Alaska 2007) (quoting *Van Sickle v. McGraw*, 134 P.3d 338, 341 n.10 (Alaska 2006)) (internal quotation marks omitted).

[28] *Kelly v. Joseph*, 46 P.3d 1014, 1017 (Alaska 2002) (alterations omitted) (quoting *Hermosillo v. Hermosillo*, 797 P.2d 1206, 1209 (Alaska 1990)) (internal quotation marks omitted); *see also VinZant v. Elam*, 977 P.2d 84, 87 (Alaska 1999) (concluding that a custodial parent's interference with a non-custodial parent's "visitation rights is sufficient to establish the threshold burden of changed circumstances").

[29] *Kelly*, 46 P.3d at 1017 (quoting *Pinneo v. Pinneo*, 835 P.2d 1233, 1238 (Alaska 1992)).

[30] *Hermosillo*, 797 P.2d at 1209. In *Hermosillo*, the custodial parent unilaterally imposed conditions on the custody order "which substantially interfere[d] with the noncustodial parent's visitation rights." *Id.* Without court approval, the custodian had required the visiting parent to provide three weeks' notice and created further logistical difficulties involving the location of exchange and the choice of visitation supervisor. *Id.* at 1208. We concluded that this obstruction could constitute a change in circumstances and remanded for potential modification of the visitation order. *Id.* at 1209.

The custody agreement at issue in *Kelly v. Joseph* granted the father primary physical custody and granted the mother visitation rights.[31] The father inhibited phone contact between the children and their mother, denied one Christmas visit, and cut short another one without good reason.[32] We agreed that the father's breach of the visitation provisions satisfied the "changed circumstances" requirement for modifying custody.[33]

In this case, Graham's interference with Jane's visitation rights was obvious and significant. He took Gabby from Cordova to Anchorage, then from Anchorage to California, without informing Jane beforehand. By so doing he caused Jane to miss six every-other-weekend visitations in a row.[34] His disregard for Jane's rights was compounded by his failure for over two months to inform her they had left Cordova, where they had gone, and when they could be expected to return, and by his failure to provide any contact information so that Jane could at least communicate with Gabby during their separation. And even when Graham finally divulged the basic information — via his attorney's letter, faxed to the Cordova Family Resource Center — he still failed to provide any means of contact between Jane and her daughter. Instead he

---

[31]    46 P.3d at 1016.

[32]    *Id.* at 1017-18.

[33]    *Id.* at 1018-19.

[34]    Graham appears to contend that he had a right to retain Gabby in his custody so long as he compensated Jane with more visitation days later. But Graham had no right to unilaterally adjust the provisions of the order. *See Hermosillo*, 797 P.2d at 1209. Any deviations from the order — whether or not they were made up for later — interfered with Jane's visitation rights and support the finding of a change in circumstances.

informed Jane that he had enrolled Gabby in school in California and intended to remain there another three months.

Graham relies heavily on his critical medical condition as excusing his failure to inform Jane of Gabby's whereabouts. But he did manage to communicate with the Cordova Family Resource Center shortly before the next scheduled visitation, albeit through his wife and cryptically. Even after his release from the hospital in early April he continued to ignore Jane's visitation rights for two more weeks, and when he did communicate with her, through his attorney, he still failed to provide any means of contact between Gabby and Jane. Another month went by before he called the Family Resource Center himself, only to demand that Jane pay Gabby's way back to Cordova if she wanted her visitation to resume.

The superior court considered this evidence and found that Graham kept Gabby away from Jane with an intent to continue doing so "for a protracted period." The court's factual finding amply supports the conclusion that Graham substantially interfered with Jane's visitation rights. This was a substantial change in circumstances justifying a modification of the existing custody arrangement.

### 2. The superior court did not err in determining that it was in Gabby's best interests to modify the custody order.

Once a court determines there has been a change in circumstances, it must assess the factors of AS 25.24.150(c) to determine whether a custody modification is in the best interests of the child.[35] The superior court made findings on each relevant statutory factor and on balance found that they favored an award of sole legal and primary physical custody to Jane.

---

[35] AS 25.20.110(g); *Kelly*, 46 P.3d at 1018.

Graham challenges this award, reasoning that he had legal custody under the prior order; that it was therefore up to him to decide whether moving to California was in Gabby's best interests; and that his stay in California was temporary, and a temporary departure from the visitation schedule cannot amount to a change in circumstances justifying a modification of custody. But as explained above, the superior court's modification order was clearly supported by its findings about Graham's interference with Jane's visitation rights.

Having found a change in circumstances, the superior court made a number of other findings in support of its decision that modifying custody was in Gabby's best interests. It found that there was love and affection between Gabby and both parents, "so this factor does not change the balance of the other factors." It found that while the parents had been equally capable of caring for Gabby when the 2006 order was entered, Graham's serious heart issues now jeopardized his capability; this factor favored Jane. It found that Jane was better positioned to provide Gabby a stable home in Cordova given Graham's frequent travel for medical appointments. It found that Jane now had the "better ability and willingness to care for the emotional, religious and social needs of [Gabby]" given Graham's medical limitations and the "little evidence" presented by Graham that he "has any willingness or ability to meet these needs."

The court also found that Jane "appears willing to facilitate [Gabby's] relationship with [Graham] to some extent but by contrast [Graham] seems less willing to facilitate [Gabby's] relationship to [Jane]." The court took into account Graham's travel to California with Gabby, which, as discussed above, amounted to substantial interference with Jane's visitation rights and was appropriately considered, even though not amounting to domestic violence. Finally, it found no relevant evidence of substance abuse in either household.

The superior court's factual findings are not clearly erroneous, and we see no abuse of discretion in its weighing of the best interest factors. "We will not reweigh the evidence when the record provides clear support for the trial court's ruling."[36] We affirm the superior court's conclusion that it was in Gabby's best interests to award sole legal and primary physical custody to Jane.

**C.     Any Error In The Admission Of The Child's Hearsay Statements Was Harmless.**

Graham challenges the court's consideration of testimony given by Jane and the executive director of the Cordova Family Resource Center, relaying statements Gabby allegedly made to them about her preference to be with Jane. Graham argues that Gabby's statements are hearsay and do not fall within any exception to the hearsay rule.[37] But we need not decide whether the evidence was properly admitted, because the superior court expressly declined to rely on it in deciding Jane's motion.

At the close of the evidentiary hearing, Graham's counsel reiterated an objection to any consideration of Gabby's preference "on the basis of the child's age"; the judge responded that he had looked at relevant case law, concluded that he had "some leeway" given that Gabby was about ten years old, but that "frankly, that's certainly not going to be the factor the court's going to make a decision on." In its written findings and conclusions, the court declined to consider the evidence at all: "[Gabby] has apparently a preference for [Jane], but this court does not consider the evidence it has on

---

[36]     *Kelly*, 46 P.3d at 1019.

[37]     *See* Alaska R. Evid. 801.

[Gabby's] preferences nor her capacity to make any decision on this factor adequate to give weight to this factor."[38]

Graham contends on appeal that the superior court "had to have been influenced by the heart-warming testimony of how the child wants to live with her mommy," but we credit the superior court's express statement about its consideration of this issue. Because the child's preference was given no weight in the superior court's analysis, we need not decide whether it was error to admit the evidence.[39]

### D. Any Error In The Admission of Evidence Of Graham's Old Criminal Convictions Was Harmless.

Graham argues that the superior court erred by admitting evidence that he was criminally convicted in 1996 and 1997 for concealment of merchandise. Graham objected at the hearing on the basis of Alaska Evidence Rule 609(a), contending that the convictions were more than five years old and also irrelevant. The court admitted the evidence preliminarily, citing the Rule 609(b) exception which grants a judge discretion to "allow evidence of the conviction . . . after more than five years have elapsed if the court is satisfied that admission in evidence is necessary for a fair determination of the case."

As Graham acknowledges, the superior court had already been informed of the convictions in the custody investigator's report. And the evidence was cumulative, given the evidence of similar and more recent charges that Graham does not challenge on appeal. The superior court did not mention the convictions or the more

---

[38]     Under AS 25.24.150(c)(3), the court was required to consider "the child's preference if the child is of sufficient age and capacity to form a preference."

[39]     *See Brandner v. Hudson*, 171 P.3d 83, 87 (Alaska 2007) ("[E]ven where the trial court errs in admitting evidence, we will reverse only if that error was not harmless." (citing *Alderman v. Iditarod Props., Inc.*, 104 P.3d 136, 142 (Alaska 2004))).

recent criminal charges in its written findings and conclusions, and there is no indication that they influenced the court's decision. With no reason to believe that Graham was unfairly prejudiced by admission of the evidence of his criminal convictions, we conclude that any error in its admission was harmless.

## V.    CONCLUSION

We AFFIRM the order of the superior court modifying custody.